Frederick A. Brodie
Peter Ostrovski
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10038
Telephone: (212) 858-1464
fab@pillsburylaw.com
peter.ostrovski@pillsburylaw.com

*Attorneys for Plaintiffs Evergreen Line*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EVERGREEN LINE,

                            Plaintiff,

               -against-

EMPRESAS BERRIOS, INC.
   d/b/a MUEBLERIAS BERRIOS,

                         Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

\_\_\_ Civ. _____

**COMPLAINT**

14 CV 7638

Plaintiff Evergreen Line, by its attorneys, Pillsbury Winthrop Shaw Pittman LLP, for its complaint in this action respectfully alleges:

**Nature of the Action**

1.     This is an action for payment under written agreements between the parties.

**The Parties**

2.     Plaintiff Evergreen is an international maritime corporation conducting business in the Commonwealth of Puerto Rico through their exclusive agents, Puerto Rico Importing & Stevedoring Co. Among other things, Evergreen contracts with parties to ship goods from international origins to Puerto Rico.

1

3.     Empresas Berrios, Inc. d/b/a Mueblerias Berrios ("**Berrios**") is a corporation organized under the laws of the Commonwealth of Puerto Rico.  Berrios is an international importer of goods whose address is Carr. #172, KM 49.7, Int. Carr. 787, Bo. Bayamon, Cidra, Puerto Rico, 00739.  Berrios is a retail seller of furniture.

## Jurisdiction and Venue

4.     This dispute arises under certain maritime contracts entered into between the parties.  The Court has federal admiralty jurisdiction under 28 U.S.C. § 1333.  *See Stemcor UK Ltd. v Sesa International Ltd*, 2009 WL 1424008 at *2 (S.D.N.Y. May 28, 2009)("Second, maritime jurisdiction is appropriate because Plaintiff seeks demurrage costs, which are traditional maritime claims."); *see also C. Transp. Panamax, Ltd. v. Kremikovitzi Trade E.O.Q.D.*, 2008 2008 WL 2546180, at *2 (S.D.N.Y. Jun. 19, 2008) ("Because the payment of demurrage was an obligation of the chaterer under the charter party, there is no question that the obligation relates to maritime service and transactions.")

5.     The Service Contracts (defined below) entered into by the parties contain consents to litigation of disputes in the United States District Court for the Southern District of New York. See Section 14 of the Service Contracts (defined below).   Venue is proper within this District.

## Factual Allegations

6.     Evergreen and Berrios entered into certain service contracts, namely: (a) Service Contract No. 47252, dated April 14, 2012; (b) Service Contract No. 50244, dated March 28, 2014; and (c) Service Contract No. 47252, dated April 17, 2014 (each a "**Service Contract**," and collectively, as may have been amended from time to time, the "**Service Contracts**").   True and accurate copies of the Service Contracts (without voluminous and repetitive appendices) are attached as **Exhibits 1 – 3**.

7.     Each Service Contract states that "This is a service contract pursuant to the Ocean Shipping reform Act of 1998 and FMC rules at 46 C.F.R. 530 et, seq. between "CARRIER" and "MERCHANT" (or, jointly, "PARTIES") parties named herein."

8.     Each Service Contract identifies the "Carrier Name" as "Evergreen Line."

9.     Each Service Contract identifies the "Merchant Name" as "MUEBLERIAS BERRIOS."

10.     Each Service Contract was signed by Evergreen and Berrios, and no other individuals or entities.

11.     Each Service Contract states that "This Contract is made between the aforesaid Contract Parties for the transportation of the commodities as listed below covered by the following clauses and conditions."

12.     Subparagraph 1.4 of each Service Contract states: "Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use this Agreement."

13.     Subparagraph 1.1 of each Service Contract allows Berrios to identify in writing "affiliates, subsidiaries or third Parties" who may use such Service Contract.  Said "affiliates, subsidiaries or third Parties" are identified on Appendix A to each Service Contact.

14.     Appendix A to each Service Contract identifies an entity named "Super Buy Furniture."  A true and accurate copy of Appendix A is attached hereto as **Exhibit 4**.

15.     Part "6" of each Service Contact is entitled "CONTRACT RATES AND CHARGES".

16.     Subparagraph 6.1 of each Service Contract states "In consideration of this Contract, the Carrier agrees that the following Contract Rates, Notes and Charges will apply: (Please see Appendix E, F)."

17.     Appendix F to each Service Contract states: "Except otherwise specified, all rates in this contract are subject to the addition of all charges as per published in governing tariff at time of shipment, including but not limited to following charges:  Demurrage Charges / Equipment Detention Charges."  A true and accurate copy of Appendix F is attached hereto as **Exhibit 5**.

18.     Between approximately February 2013 and June 30, 2014, demurrage charges totaling approximately $988,570.00 (the "**Demurrage Charges**") were incurred but not paid under the Service Agreements with respect to commodities shipped to Super Buy Furniture.

19.     On August 8, 2014, Evergreen sent a letter to Berrios demanding that (pursuant to Subparagraph 1.4 of the Service Agreement) Berrios pay Evergreen the Demurrage Charges by August 18, 2014.  A copy of said letter is attached as **Exhibit 6**.

20.     Berrios subsequently acknowledged receipt of Evergreen's August 8, 2014 letter, but has failed and refused to pay the Demurrage Charges.

## CLAIM FOR RELIEF:
## BREACH OF CONTRACT

21.     Evergreen repeats the allegations in paragraphs 1-20 above as though fully pleaded herein.

22.     Evergreen and Berrios are parties to the Service Contracts.

23.     Demurrage Charges in the amount of at least $988,570.00 were incurred and are due and owing under the Service Contracts.

24.    Subparagraph 1.4 of each Service Contract states that "Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use this Agreement."

25.    "Complete performance of this agreement" (meaning each Service Contract), includes payment of the Demurrage Charges incurred under each Service Contract.

26.    The only "Merchant signing this [each Service Contract]" was Berrios.

27.    Berrios has failed to completely perform each Service Contract by virtue of its refusal to pay the Demurrage Charges incurred under each Service Contract.

28.    The failure by Berrios to pay the Demurrage Charges and to completely perform each Service Contract constitutes a breach of each Service Contract.

29.    The breaches by Berrios of the Service Contracts have resulted in damages to Evergreen in the amount of at least $988,570 in Demurrage Charges.

30.    Subparagraph 14 of each Service Contract states, in part, that:

> "Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall at Carrier's option be subject to litigation in the United States District Court for the Southern District of New York . . ."

31.    Subparagraph 14 of the each Service Contract also states, in part,

> "In any such litigation or arbitration, the prevailing party shall be entitled to its cost of litigation and/or arbitration as applicable together with attorney's fees and expenses."

32.    Evergreen has incurred and continues to incur costs of litigation, including attorney's fees and expenses.

WHEREFORE, Evergreen respectfully requests that the Court enter judgment against Berrios for damages in the amount found at trial, but at a minimum for $988,570.00 in Demurrage Charges.  In addition, Evergreen respectfully requests that the Court enforce subparagraph 14 of each Service Contract, and award (by way of additional or supplemental judgment) Evergreen its costs of litigation together with attorney's fees and expenses.  Evergreen prays for such other and further relief as may be just or otherwise determined by the Court.

Respectfully submitted,

Dated: September 19, 2014

By: _____

Frederick A. Brodie
Peter Ostrovski
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10038
Telephone: (212) 858-1464
fab@pillsburylaw.com
peter.ostrovski@pillsburylaw.com

*Attorneys for Plaintiffs Evergreen Line*

# EXHIBIT 1

SCXXXXXX

Service Contract No.: | SCxxxxx | Amendment No.:

Service Contract Essential Terms Publication No.: | EGLV-600

(Tariffs of General Applicability No.): | EGLV-601, 618

**Carrier Name:** **Evergreen Line**
**A Joint Service Agreement (FMC#011982)**
**consisting of**
**1) Evergreen Marine Corp. (Taiwan) Ltd.**
**2) Evergreen Marine (UK) Limited**
**3) Italia Marittima SpA**
**4) Evergreen Marine (Hong Kong) Ltd.**
**5) Evergreen Marine (Singapore) Pte. Ltd.**

**Merchant Name:**       MUEBLERIAS BERRIOS

Further, MERCHANT party named herein certifies its status and that of any affiliate(s)/subsidiary(ies) named herein as (check appropriate box(es)):

NVOCC                           | Bond No.:        Org.No.
MERCHANTS' ASSOCIATION          |
OWNER OF CARGO         [X]      |
OTHER (Please Specify)          |

_____ Date 4/17/12         _____ Date 4/17/12
Elena Vizcarrondo                  Mr. Noel Berrios
Account Executive                  President
Evergreen Shipping Agency (America) Corp.   Mueblerias Berrios
As Agent for Evergreen Line

EGA-0058-31 02/09/12

SC-XXXXX

This is a service contract pursuant to the Ocean Shipping reform Act of 1998 and FMC rules at 46 C.F.R. 530 et. seq., between "CARRIER" and "MERCHANT" ( or, jointly, "PARTIES") parties named herein. The contract Parties declare that the terms set forth herein together with the essential terms as published in Carrier Service Contract Essential Terms Tariffs No. EGLV-600, pursuant to 46 CFR 520.4(d), the rules published in the tariff in the Carrier Automated Publication which can be found at www.evergreen-line.com constitute the true and complete copy of all aspects of this contract except as to confidential matters contained herein which, pursuant to the Ocean Shipping Reform Act of 1998, shall be included in the essential terms filing and publication.

Records maintained to support shipments under this Service Contract are: bills of lading, shipping manifests, and other related written correspondence between Contract Parties.

Contact person for records in the event of a request by the Federal Maritime Commission:

     Evergreen Shipping Agency (America) Corp.
     Manager of Tariff Department
     One Evertrust Plaza,
     Jersey City, NJ 07302
     (201) 761-3361  FAX (201) 761-3005
     e-mail : ibdbcdtrf@evergreen-shipping.us



**Address for Carriers:** 1) 166, Min-Sheng East Road, Sec. 2,
               Taipei, Taiwan, R.O.C.
          2) Evergreen House 160 Eustion Rd.
               London, NW12DX, U.K.
          3) 4 Passeggio S.Andrea, 34123
               Trieste, Italy
          4) 22-23 Floor, Harcourt House,
               39 Gloucester Road, Wan Chai, Hong Kong
          5) 200 Cantonment Road, #12-01 Southpoint
               Singapore 089763

**Address for Merchants:**

**Name and Address of Affiliates: (Please see Appendix A )**

2

SC-XXXXX

This Contract is made between the aforesaid Contract Parties for the transportation of the commodities as listed below covered by the following clauses and conditions.

**Commodity: (Please see Appendix B )**

1.    CONTRACT PARTIES AND DURATION

1.1    The Service Contract is only applicable to the Merchant identified herein and any affiliates, subsidiaries or third Parties which are specifically identified in writing in this Contract. This Contract shall not be used by any Party not specifically identified herein. Any use of this Contract by Parties other than those specified herein shall be grounds for termination of this Agreement.

1.2    If, after execution of this Contract, the Merchant acquires a company that ships the commodities covered under this Contract, the newly acquired company's tonnage may be included under the Contract after the Merchant has submitted to the Carrier documentary proof of such acquisition and the Carrier has concurred in such inclusion. Also if, after execution of this Contract, the Merchant proposes to delete an entity from the list of its Affiliates, upon concurrence by the Carrier such entity shall cease to be a Party to this Contract.

1.3    This Contract shall have effect from the date of April/15/2012 through April/14/2013 46 C.F.R. 530.12 requires that certain Essential Terms of Service Contract shall be published as a separate part in the Carrier Automated Tariff Publication. The Contract Rates and Terms shall not be implemented prior to the effective date of the tariff Essential Terms filing, made coincident with that publication with the U.S. Federal Maritime Commission.

1.4    The Merchant whether he be a beneficial owner of the cargo, NVOCC or other is entering into this Service Contract as an independent contractor and in no event shall be considered an agent of the Carrier whether under this Service Contract or the Carrier's bill of lading/Sea Waybill. Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use the Agreement.

2.    GENERAL APPLICATION:

2.1    This Contract shall be governed by the prevailing and effective rules of Carrier's Service Contract tariff in effect at the time of shipment, including reissues and amendments thereto, unless otherwise specified in the Contract.

Cargo covered by this Contract shall be carried by vessels owned, chartered, managed or operated by the Carrier under the provisions of the Carrier's Bill of Lading and the Rules and Regulations of the pertinent Tariff(s) of General Applicability. "Notwithstanding the foregoing, if a conflict of terms arises, the provisions as per the Bill of Lading shall prevail."

2.2    For the purposes of this Contract, the term Merchant shall mean the owner of the cargo or the person for whose account the ocean transportation of the cargo is to be provided or the person to whom delivery is to be made.

3

SC-XXXXX

2.3     The Carrier reserves the right to cancel this Contract immediately upon written notice to the Merchant upon occurrence of one of the following:

(1)The Merchant becomes insolvent.

(2)The Merchant files a Bankruptcy Petition.

(3) The Merchant commits any act which defrauds or endangers the interests of the Carrier, its vessels, including chartered vessels and vessels provided by its slot charter partners, its agents, subcontractors, equipment of personnel, including but not limited to: illegal movement of contraband or other commodities without proper legal license in the countries of origin or destination; improper stuffing, blocking or labeling of cargo in such a manner as to pose a danger to the Carrier, its agents, equipment or personnel.

(4) The merchant fails to pay freight and charges when due hereunder and

(5) The merchant is found to be holding itself out as the agent for the carrier in merchant's Bill of lading or alternatively is allowing unauthorized shippers to use this service contract.

2.4     The Carrier further reserves the right to cancel this Contract upon 30 days prior written notice to the Merchant upon occurrence of any one of the following:
The performance of the Merchant under the Contract indicates that it will be unable to meet the Minimum Volume Commitment set forth herein.

The Merchant is found to be mis-declaring commodities shipped, shipping goods under the Contract which are not included in the commodities listed in the Contract or is found to be allowing non-Contract Parties to use the Contract.

The Merchant is found to be improperly labeling hazardous, poisonous or dangerous goods in violation of Coast Guard regulations and International Conventions.

If this Contract is cancelled pursuant to this subparagraph 2.3, 2.4 all shipments shall be re-rated as per non-contract tariff rate applicable at time of shipment(s). (Or, if there is no applicable commodity rate, the cargo shall be re-rated at 130% of the applicable service contract rate together with all applicable surcharges).

3.     SERVICE COMMITMENT:

3.1     During the term of this Contract, the Carrier agrees to make available vessel capacity adequate to carry (a) the Minimum Quantity Commitment of cargo as specified in Article 5, and (b) at the Carrier's option, any additional cargo tendered by the Merchant. The Merchant agrees that, insofar as possible, cargo committed under this Contract will be shipped evenly throughout the duration of the Contract. The Merchant agrees to give booking notice to the Carrier at least seven (7) working days in advance of sailing date for port-to-port cargo, and at least fourteen (14) working days in advance of the sailing date for cargo originating at an inland point for Carrier haulage (Intermodal cargo).

3.2     The Carrier and Merchant agree that in light of the fact that the volume and timing of cargo tendered hereunder for particular sailings is in the control of the Merchant, who cannot specify with certainty the amount of cargo which it will tender on any given date, and by virtue of the fact that the Carrier has a finite amount of space on its vessels in which to carry the Merchant's cargo as well as cargo carried pursuant to Service Contracts entered into with other Merchants in the trade, some flexibility is needed by the Carrier with respect to its service commitment to the Merchant hereunder. Accordingly,

4

SC-XXXXX

the parties hereto agree that in the event that the Merchant is unable to secure space on any particular vessel of the Carrier after giving timely booking notice to the Carrier defined in subparagraph 3.1 , then, upon the Merchant's written request submitted within seven (7) working days of such occurrence together with essential supporting documents which are later confirmed to be accurate, the Merchant may elect one of the following options:

3.2.1 The Carrier will subtract the quantity of cargo tendered but not carried on Carrier's vessel from the Minimum Quantity Commitment. However, any such reduction of Minimum Quantity Commitment shall not exceed the quantity counted on a pro rata basis. Such pro rata basis shall be defined as the Minimum Quantity Commitment divided by the Carrier's total sailings from all ports of loading named in Article 4 (cumulatively) during the term of the Contract, or,

3.2.2 If the Merchant does not elect to reconcile the shortage by reducing the Minimum Quantity Commitment set forth in Article 5, pursuant to subparagraph 3.2.1 above, then such shortage will be reconciled upon expiration of the Contract by extending the term of the Contract pursuant to the following formula:

No. of TEUS (FEUS if
applicable) deductible
pursuant to Clause 3.2.1  =  Maximum Number
----------------------------       of Additional
The pro rata basis (as        Sailings
defined in Clause 3.2.1

Notwithstanding the above formula, in no event shall the extension exceed ten (10) consecutive sailings. The extension of the term of this Contract pursuant to this Section must be filed in writing on or before the expiration date with the FMC as per 46 C.F.R. 530.8.

4. SERVICE PERFORMED BY THE CARRIER - ORIGIN/DESTINATION:

4.1 Origin – Port Ranges and Geographic Points
    (Please see Appendix D )

4.2 Destination – Ports Ranges and Geographic Points
    (Please see Appendix D )

4.3 Service Type

    4.3.1 Water and/or Intermodal Service.
    Intermodal shipments will be received at or delivered to the terminal, ramp or depot designated by the Carrier, unless otherwise specified in Attachments hereto.

SC-XXXXX

5.    MINIMUM QUANTITY COMMITMENT:

In consideration of this Contract's rates, charges and terms specified herein, the Merchant agrees to tender to the Carrier, a minimum of **1200 TEUS FCL/FCL (LCL/FCL)** containers loaded with commodities as specified herein which shall be tendered to Carrier evenly throughout the terms of this contract, (hereinafter "Minimum Quantity Commitment"). For the purpose of this Contract, a 20' container is a dry cargo (8'6" high) standard container, without chassis attached, except as otherwise specified in this Contract for special equipment provided by the Carrier.   For the calculation of the Minimum Quantity Commitment and liquidated damages under this Contract, the following shall apply:

20 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 TEU

40 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 FEU OR 2.00 TEU

40 - FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.125 FEU OR 2.25 TEU

45'- FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.266 FEU OR 2.53 TEU

6.    CONTRACT RATES AND CHARGES:

6.1    In consideration of this Contract, the Carrier agrees that the following Contract Rates, Notes and Charges will apply:  **(Please see Appendix E,F)**

Surcharges, Additional Charges Clause:

Except as specifically provided in this Article 6, all charges, surcharges, arbitraries, origin and destination delivery charges, add-ons and other additional charges, and all rules in the Carrier's pertinent Tariff of General Applicability, which would thereunder be applicable to the movement of the commodities covered by this Contract shall be assessed in full at the time of shipment.

Notwithstanding other provision of this Contract, including but not limited to any "no-new-surcharge" clause, Shipper shall be subject to any rule in the Governing Tariff establishing a charge relating to any of the following circumstances or charges arising or taking effect subsequent to the effective date of this Contract: a strike, lockout, work stoppage, or other labor unrest; origin or destination port or inland congestion; security requirements or costs; taxes, fees or charges levied by any federal, state or local governmental entity, or by any port or harbor authority; increased inland transportation costs resulting from federal, state, or local legislative or regulatory action, including action by any port or harbor authority; or clean air requirements ; or increased cost due to war risk and terrorism.

In the event of any conflict between the terms on this Article 6.1 and Article 7 (Force Majeure), the terms of Article 6.1 shall prevail.

SC-XXXXX

7.    FORCE MAJEURE CLAUSE:

In the event that the execution of obligations entailed by this Contract are prevented by Force Majeure circumstances, including work stoppages, strikes, accidents, casualties, lockouts, fire, transportation disasters, acts of God, governmental restraints (including governmental import restrictions and voluntary quotas arising from the threat of governmental restraints), war or hostilities, terrorism, piracy, embargoes or other similar conditions except commercial contingencies (e.g., changing markets, business declines, etc.), or civil commotions, the Merchant or the Carrier shall notify the other party in writing of the existence of such circumstances within seven (7) working days of such occurrence and of the effect on its ability to perform its obligations hereunder. Upon receipt of such written notice and establishment of the existence of Force Majeure conditions, as supported by essential documentation, the parties shall be excused from their obligations under this Contract to the extent of and for the duration of the disability. Upon cessation of the disability, the Contract obligations shall be reinstated, and the Minimum Quantity Commitment in Article 5 shall be adjusted by 1/ XXX per day of the actual effectiveness of the disability rounded upwards to the next full container. (The Merchant and the Carrier agree that publication by the Carrier of appropriate paid notices in widely distributed trade publications shall constitute notice to the Merchant in writing under this Article 7);

8.    LIQUIDATED DAMAGES CLAUSE:

8.1    The Carrier and the Merchant agree that breaches of this Contract cause not only loss of freight but also instability and adverse impact on Carrier marketing, logistics and stowage planning, and accordingly, agree that in lieu of all damages which are difficult to calculate, liquidated damages shall be assessed if the Merchant fails to tender either the Minimum Quantity Commitment or any other sub-Minimum Quantity Commitment(s) wherever specified in this Contract.  Upon the occurrence of such failure by the Merchant, the Carrier shall invoice the Merchant and the Merchant agrees to pay liquidated damages on the difference between the quantity of cargo actually shipped and the Minimum Quantity Commitment, or where applicable any other sub-Minimum Quantity Commitment(s), at the rate of US$250 per FEU. The total of any amounts due hereunder shall be paid directly to the Carrier within thirty (30) days following issuance of written notification by the Carrier. The amount is hereby acknowledged and agreed upon as reasonable liquidated damages and not as a penalty.  In the event that liquidated damages pursuant to this clause are not paid by the Merchant within thirty (30) days, the Merchant shall be liable to the Carrier for all costs incurred in collecting said liquidated damages including but not limited to court costs, expenses and attorney's fee incurred in the collection thereof.



8.2    If the Carrier fails to fulfill its Service Commitment in Article 3 hereof during the Contract term, the Merchant's remedy shall be either (1) reduction of the Minimum Quantity Commitment by the quantity of cargo tendered but not carried as provided in subparagraph 3.2.1 or, (2) the extension of the Contract term as specified in Clause 3.2.2.  The Carrier shall not be liable to the Merchant for any direct, consequential or other damages under this Contract, except as set forth in Article 3, nor shall any liabilities or obligations of the Merchant to the Carrier be subject to any offset or credit by virtue of any monies which the Merchant may claim are due him under this Contract or otherwise.

7

SC-XXXXX

9.   **AUDIT AND RECORD RETENTION:**

The Carrier and the Merchant shall maintain records and conduct audits in accordance with the requirements of the Federal Maritime Commission and the Shipping Reform Act of 1998. The Merchant agrees to provide the Carrier's Record Keeper with all the pertinent records, bill of lading or other shipping documents that it has in its possession, which may be required to substantiate the proper application of the Service Contract rates. The records shall be available for Commission's inspection at the following address:

Evergreen Shipping Agency (America) Corp.
as agent for Evergreen Line
One Evertrust Plaza,
Jersey City, NJ 07302
Contact Person: Manager of Tariff Department.
Tel: (201) 761-3361

10.  **ASSIGNMENT CLAUSE:**

The Merchant may not assign this Contract, including any or all of its right or liabilities hereunder, or otherwise permit any other person or entity, directly or indirectly, to utilize service rates or other terms provided by the Carrier hereunder, without the prior written consent of the Carrier. Without limitation of the foregoing, the Merchant agrees that it will not permit any other person or entity to co-load or otherwise include such other person's or entity's cargo in containers or other cargo carrying equipment tendered by the Merchant to the Carrier hereunder. If the Carrier, in its exclusive discretion, has reason to suspect that the Contract has been assigned, in whole or in part, by the Merchant, or that the Merchant has otherwise violated this provision, the Carrier may require the Merchant to produce documentation evidencing the Merchant's compliance therewith. In the event that the Merchant does not provide such documentation within thirty (30) days of the Carrier's request for same, the Carrier shall be entitled to conclude that the Merchant has violated this provision. Any container or other cargo carrying equipment tendered in violation of this provision shall be re-rated at twice the otherwise applicable rates and charges set forth in the Carrier's governing tariff(s), and the Carrier may also, at its option, terminate this Contract.



11.  **TERMINATION:**

After the Minimum Volume has been achieved and before the expiration date of this Contract, either party shall have the right to unilaterally terminate this Contract by providing a written notice of such termination to the other party.

12.  **SEVERABILITY:**

The Parties agree that if any clause of this Contract is held to be unenforceable, the remainder of the Contract shall remain in full force and effect.

13.  **INTEGRATION:**

This Contract constitutes the entire agreement between the Parties. Any Amendment to the Terms of this Contract may only be made by written agreement signed by both Parties (and, such agreement shall be filed with the Federal Maritime Commission and, if the Amendment is not subject to confidentiality and per the Ocean Shipping reform Act the Essential Terms shall likewise be updated).

SC-XXXXX

14. **ARBITRATION AND CHOICE OF LAW:**

Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall at Carrier's option be subject to litigation in the United States District Court for the Southern District of New York or, alternatively, at Carrier's option shall be referred to arbitration before a panel of 3 arbitrators, one to be appointed by each of the Parties hereto and the third by the two so chosen. Their decision or that of any two of them shall be final, and, such award shall be enforceable pursuant to the Convention of the Recognition and the Enforcement of Foreign Arbitral Awards. In the event the Carrier chooses to exercise its option to arbitrate any dispute involved with the Contract, such arbitration shall take place pursuant to the Rules and Regulations of the Society of Maritime Arbitrators of the United States. This Contract is to be governed by and construed in accordance with the laws of the United States and the State of New York. In any such litigation or arbitration, the prevailing party shall be entitled to its cost of litigation and/or arbitration as applicable together with attorney's fees and expenses.

15. **MARITIME PORT SECURITY ACT OF 2002:**

Shipper certifies that it will adhere to the provisions of the Maritime Transportation Security Act of 2002 and that in the event of any failure to do so it will indemnify, defend and hold Carrier harmless in the event of any claims, delays or penalties resulting from Shipper's failure to comply with the provision of said Act.

Notwithstanding any provision to the contrary in this Service Contract or any governing publication, including any limitation or restriction on the application of new surcharges during the term of this Contract, the parties agree that the following charges shall apply to the extent published in a publication governing this Contract at any time during the term of the Contract:

Any charge or surcharge relating to costs incurred in connection with newly-established security requirements (whether established by law, statute, regulation, or by a service provider to Carrier) applicable to or relating to any portion of the transportation and related services provided under this Contract.

16. **Hazardous Material**

Regardless how the cargo is booked, Merchants shall be obligated to provide the Carrier in advance of shipment, with all up to date information within its knowledge as to the requirements for the safe care, custody and Carriage of the Goods.

17. Merchant certifies to Carrier that it will adhere to all requirements of the Department of Homeland Security in regard to information that has to be provided to the Department of Homeland Security in a timely fashion and Merchant further agrees that in the event that, for any reason, it does not provide the necessary information in a timely fashion and penalties are levied by the Department of Homeland Security or any other government agency, it will indemnify, defend and hold Carrier harmless from any and all such penalties that may be assessed as a result thereof.

9

# EXHIBIT 2

SCXXXXX

Service Contract No.: **SC 50244**    Amendment No.: _____

Service Contract Essential Terms Publication No.:    **EGLV-600**

(Tariffs of General Applicability No.):    **EGLV-601, 618**

**Carrier Name:**    **Evergreen Line**
**A Joint Service Agreement (FMC#011982)**
**consisting of**
**1) Evergreen Marine Corp. (Taiwan) Ltd.**
**2) Evergreen Marine (UK) Limited**
**3) Italia Marittima SpA**
**4) Evergreen Marine (Hong Kong) Ltd.**
**5) Evergreen Marine (Singapore) Pte. Ltd.**

**Merchant Name:**    MUEBLERIAS BERRIOS

Further, MERCHANT party named herein certifies its status and that of any affiliate(s)/subsidiary(ies) named herein as (check appropriate box(es)):

| | | |
|---|---|---|
| NVOCC | [ ] | Bond No.: _____ Org.No. |
| MERCHANTS' ASSOCIATION | [ ] | |
| OWNER OF CARGO | [X] | |
| OTHER (Please Specify) | [ ] | |

_(signature)_    Date 3·28·13
Elena Vizcarrondo
Account Executive
Evergreen Shipping Agency (America) Corp.
As Agent for Evergreen Line

_(signature)_    Date 27/3/2013
Mr. Noel Berrios
President
Mueblerias Berrios

EGA-0058-31 02/09/12

SC-XXXXX

This is a service contract pursuant to the Ocean Shipping reform Act of 1998 and FMC rules at 46 C.F.R. 530 el, seq., between "CARRIER" and "MERCHANT" ( or, jointly, "PARTIES") parties named herein.  The contract Parties declare that the terms set forth herein together with the essential terms as published in Carrier Service Contract Essential Terms Tariffs No. EGLV-600, pursuant to 46 CFR 520.4(d), the rules published in the tariff in the Carrier Automated Publication which can be found at www.evergreen-line.com constitute the true and complete copy of all aspects of this contract except as to confidential matters contained herein which, pursuant to the Ocean Shipping Reform Act of 1998, shall be included in the essential terms filing and publication.

Records maintained to support shipments under this Service Contract are: bills of lading, shipping manifests, and other related written correspondence between Contract Parties.

Contact person for records in the event of a request by the Federal Maritime Commission:

> Evergreen Shipping Agency (America) Corp.
> Manager of Tariff Department
> One Evertrust Plaza,
> Jersey City, NJ 07302
> (201) 761-3361  FAX (201) 761-3005
> e-mail : ibdbcdtrf@evergreen-shipping.us

**Address for Carriers:** 1) 166, Min-Sheng East Road, Sec. 2,
   Taipei, Taiwan, R.O.C.
2) Evergreen House 160 Eustion Rd.
   London, NW12DX, U.K.
3) 4 Passeggio S.Andrea, 34123
   Trieste, Italy
4) 22-23 Floor, Harcourt House,
   39 Gloucester Road, Wan Chai, Hong Kong
5) 200 Cantonment Road, #12-01 Southpoint
   Singapore 089763

**Address for Merchants:**

**Name and Address of Affiliates: (Please see Appendix A )**

2

SC-XXXXX

This Contract is made between the aforesaid Contract Parties for the transportation of the commodities as listed below covered by the following clauses and conditions.

**Commodity: (Please see Appendix B )**

1.    CONTRACT PARTIES AND DURATION

1.1    The Service Contract is only applicable to the Merchant identified herein and any affiliates, subsidiaries or third Parties which are specifically identified in writing in this Contract. This Contract shall not be used by any Party not specifically identified herein. Any use of this Contract by Parties other than those specified herein shall be grounds for termination of this Agreement.

1.2    If, after execution of this Contract, the Merchant acquires a company that ships the commodities covered under this Contract, the newly acquired company's tonnage may be included under the Contract after the Merchant has submitted to the Carrier documentary proof of such acquisition and the Carrier has concurred in such inclusion. Also if, after execution of this Contract, the Merchant proposes to delete an entity from the list of its Affiliates, upon concurrence by the Carrier such entity shall cease to be a Party to this Contract.

1.3    This Contract shall have effect from the date of April/15/2013 through April/14/2014 46 C.F.R. 530.12 requires that certain Essential Terms of Service Contract shall be published as a separate part in the Carrier Automated Tariff Publication. The Contract Rates and Terms shall not be implemented prior to the effective date of the tariff Essential Terms filing, made coincident with that publication with the U.S. Federal Maritime Commission.

1.4    The Merchant whether he be a beneficial owner of the cargo, NVOCC or other is entering into this Service Contract as an independent contractor and in no event shall be considered an agent of the Carrier whether under this Service Contract or the Carrier's bill of lading/Sea Waybill. Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use the Agreement.

2.    GENERAL APPLICATION:

2.1    This Contract shall be governed by the prevailing and effective rules of Carrier's Service Contract tariff in effect at the time of shipment, including reissues and amendments thereto, unless otherwise specified in the Contract.

Cargo covered by this Contract shall be carried by vessels owned, chartered, managed or operated by the Carrier under the provisions of the Carrier's Bill of Lading and the Rules and Regulations of the pertinent Tariff(s) of General Applicability. "Notwithstanding the foregoing, if a conflict of terms arises, the provisions as per the Bill of Lading shall prevail."

2.2    For the purposes of this Contract, the term Merchant shall mean the owner of the cargo or the person for whose account the ocean transportation of the cargo is to be provided or the person to whom delivery is to be made.

2.3    The Carrier reserves the right to cancel this Contract immediately upon written notice to the Merchant upon occurrence of one of the following:

(1) The Merchant becomes insolvent.

(2) The Merchant files a Bankruptcy Petition.

(3) The Merchant commits any act which defrauds or endangers the interests of the Carrier, its vessels, including chartered vessels and vessels provided by its slot charter partners, its agents, subcontractors, equipment of personnel, including but not limited to: illegal movement of contraband or other commodities without proper legal license in the countries of origin or destination; improper stuffing, blocking or labeling of cargo in such a manner as to pose a danger to the Carrier, its agents, equipment or personnel.

(4) The merchant fails to pay freight and charges when due hereunder and

(5) The merchant is found to be holding itself out as the agent for the carrier in merchant's Bill of lading or alternatively is allowing unauthorized shippers to use this service contract.

2.4    The Carrier further reserves the right to cancel this Contract upon 30 days prior written notice to the Merchant upon occurrence of any one of the following:
The performance of the Merchant under the Contract indicates that it will be unable to meet the Minimum Volume Commitment set forth herein.

The Merchant is found to be mis-declaring commodities shipped, shipping goods under the Contract which are not included in the commodities listed in the Contract or is found to be allowing non-Contract Parties to use the Contract.

The Merchant is found to be improperly labeling hazardous, poisonous or dangerous goods in violation of Coast Guard regulations and International Conventions.

If this Contract is cancelled pursuant to this subparagraph 2.3, 2.4 all shipments shall be re-rated as per non-contract tariff rate applicable at time of shipment(s).  (Or, if there is no applicable commodity rate, the cargo shall be re-rated at 130% of the applicable service contract rate together with all applicable surcharges).

3.    SERVICE COMMITMENT:

3.1    During the term of this Contract, the Carrier agrees to make available vessel capacity adequate to carry (a) the Minimum Quantity Commitment of cargo as specified in Article 5, and (b) at the Carrier's option, any additional cargo tendered by the Merchant.  The Merchant agrees that, insofar as possible, cargo committed under this Contract will be shipped evenly throughout the duration of the Contract.  The Merchant agrees to give booking notice to the Carrier at least seven (7) working days in advance of sailing date for port-to-port cargo, and at least fourteen (14) working days in advance of the sailing date for cargo originating at an inland point for Carrier haulage (Intermodal cargo).

3.2    The Carrier and Merchant agree that in light of the fact that the volume and timing of cargo tendered hereunder for particular sailings is in the control of the Merchant, who cannot specify with certainty the amount of cargo which it will tender on any given date, and by virtue of the fact that the Carrier has a finite amount of space on its vessels in which to carry the Merchant's cargo as well as cargo carried pursuant to Service Contracts entered into with other Merchants in the trade, some flexibility is needed by the Carrier with respect to its service commitment to the Merchant hereunder.  Accordingly, the parties hereto agree that in the event that the Merchant is unable to secure space on

SC-XXXXX

any particular vessel of the Carrier after giving timely booking notice to the Carrier defined in subparagraph 3.1 , then, upon the Merchant's written request submitted within seven (7) working days of such occurrence together with essential supporting documents which are later confirmed to be accurate, the Merchant may elect one of the following options:

3.2.1   The Carrier will subtract the quantity of cargo tendered but not carried on Carrier's vessel from the Minimum Quantity Commitment.  However, any such reduction of Minimum Quantity Commitment shall not exceed the quantity counted on a pro rata basis.  Such pro rata basis shall be defined as the Minimum Quantity Commitment divided by the Carrier's total sailings from all ports of loading named in Article 4 (cumulatively) during the term of the Contract, or,

3.2.2   If the Merchant does not elect to reconcile the shortage by reducing the Minimum Quantity Commitment set forth in Article 5, pursuant to subparagraph 3.2.1 above, then such shortage will be reconciled upon expiration of the Contract by extending the term of the Contract pursuant to the following formula:

$$\frac{\text{No. of TEUS (FEUS if applicable) deductible pursuant to Clause 3.2.1}}{\text{The pro rata basis (as defined in Clause 3.2.1}} = \frac{\text{Maximum Number of Additional Sailings}}{}$$

Notwithstanding the above formula, in no event shall the extension exceed ten (10) consecutive sailings.  The extension of the term of this Contract pursuant to this Section must be filed in writing on or before the expiration date with the FMC as per 46 C.F.R. 530.8.

4.   SERVICE PERFORMED BY THE CARRIER - ORIGIN/DESTINATION:

4.1 Origin – Port **Ranges** and **Geographic** Points
     **(Please see Appendix D )**

4.2 Destination – Ports **Ranges** and **Geographic** Points
     **(Please see Appendix D )**

4.3 Service Type

4.3.1   Water and/or Intermodal Service.
Intermodal shipments will be received at or delivered to the terminal, ramp or depot designated by the Carrier, unless otherwise specified in Attachments hereto.

SC-XXXXX

5.  MINIMUM QUANTITY COMMITMENT:

In consideration of this Contract's rates, charges and terms specified herein, the Merchant agrees to tender to the Carrier, a minimum of **4000 TEUS** FCL/FCL (LCL/FCL) containers loaded with commodities as specified herein which shall be tendered to Carrier evenly throughout the terms of this contract, (hereinafter "Minimum Quantity Commitment"). For the purpose of this Contract, a 20' container is a dry cargo (8'6" high) standard container, without chassis attached, except as otherwise specified in this Contract for special equipment provided by the Carrier. For the calculation of the Minimum Quantity Commitment and liquidated damages under this Contract, the following shall apply:

20 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 TEU

40 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 FEU OR 2.00 TEU

40 - FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.125 FEU OR 2.25 TEU

45'- FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.266 FEU OR 2.53 TEU


6.  CONTRACT RATES AND CHARGES:

6.1     In consideration of this Contract, the Carrier agrees that the following Contract Rates, Notes and Charges will apply: **(Please see Appendix E,F)**

Surcharges, Additional Charges Clause:

Except as specifically provided in this Article 6, all charges, surcharges, arbitraries, origin and destination delivery charges, add-ons and other additional charges, and all rules in the Carrier's pertinent Tariff of General Applicability, which would thereunder be applicable to the movement of the commodities covered by this Contract shall be assessed in full at the time of shipment.

Notwithstanding other provision of this Contract, including but not limited to any "no-new-surcharge" clause, Shipper shall be subject to any rule in the Governing Tariff establishing a charge relating to any of the following circumstances or charges arising or taking effect subsequent to the effective date of this Contract: a strike, lockout, work stoppage, or other labor unrest; origin or destination port or inland congestion; security requirements or costs; taxes, fees or charges levied by any federal, state or local governmental entity, or by any port or harbor authority; increased inland transportation costs resulting from federal, state, or local legislative or regulatory action, including action by any port or harbor authority; or clean air requirements ; or increased cost due to war risk and terrorism.

In the event of any conflict between the terms on this Article 6.1 and Article 7 (Force Majeure), the terms of Article 6.1 shall prevail.

6

SC-XXXXX

7.    FORCE MAJEURE CLAUSE:

In the event that the execution of obligations entailed by this Contract are prevented by Force Majeure circumstances, including work stoppages, strikes, accidents, casualties, lockouts, fire, transportation disasters, acts of God, governmental restraints (including governmental import restrictions and voluntary quotas arising from the threat of governmental restraints), war or hostilities, terrorism, piracy, embargoes or other similar conditions except commercial contingencies (e.g., changing markets, business declines, etc.), or civil commotions, the Merchant or the Carrier shall notify the other party in writing of the existence of such circumstances within seven (7) working days of such occurrence and of the effect on its ability to perform its obligations hereunder.  Upon receipt of such written notice and establishment of the existence of Force Majeure conditions, as supported by essential documentation, the parties shall be excused from their obligations under this Contract to the extent of and for the duration of the disability.  Upon cessation of the disability, the Contract obligations shall be reinstated, and the Minimum Quantity Commitment in Article 5 shall be adjusted by 1/ <u>XXX</u> per day of the actual effectiveness of the disability rounded upwards to the next full container. (The Merchant and the Carrier agree that publication by the Carrier of appropriate paid notices in widely distributed trade publications shall constitute notice to the Merchant in writing under this Article 7).


8.  .    LIQUIDATED DAMAGES CLAUSE:

8.1    The Carrier and the Merchant agree that breaches of this Contract cause not only loss of freight but also instability and adverse impact on Carrier marketing, logistics and stowage planning, and accordingly, agree that in lieu of all damages which are difficult to calculate, liquidated damages shall be assessed if the Merchant fails to tender either the Minimum Quantity Commitment or any other sub-Minimum Quantity Commitment(s) wherever specified in this Contract.   Upon the occurrence of such failure by the Merchant, the Carrier shall invoice the Merchant and the Merchant agrees to pay liquidated damages on the difference between the quantity of cargo actually shipped and the Minimum Quantity Commitment, or where applicable any other sub-Minimum Quantity Commitment(s), at the rate of US$250 per FEU. The total of any amounts due hereunder shall be paid directly to the Carrier within thirty (30) days following issuance of written notification by the Carrier.  The amount is hereby acknowledged and agreed upon as reasonable liquidated damages and not as a penalty.  In the event that liquidated damages pursuant to this clause are not paid by the Merchant within thirty (30) days, the Merchant shall be liable to the Carrier for all costs incurred in collecting said liquidated damages including but not limited to court costs, expenses and attorney's fee incurred in the collection thereof.

8.2    If the Carrier fails to fulfill its Service Commitment in Article 3 hereof during the Contract term, the Merchant's remedy shall be either (1) reduction of the Minimum Quantity Commitment by the quantity of cargo tendered but not carried as provided in subparagraph 3.2.1 or, (2) the extension of the Contract term as specified in Clause 3.2.2.  The Carrier shall not be liable to the Merchant for any direct, consequential or other damages under this Contract, except as set forth in Article 3, nor shall any liabilities or obligations of the Merchant to the Carrier be subject to any offset or credit by virtue of any monies which the Merchant may claim are due him under this Contract or otherwise.

SC-XXXXX

9.    AUDIT AND RECORD RETENTION:

The Carrier and the Merchant shall maintain records and conduct audits in accordance with the requirements of the Federal Maritime Commission and the Shipping Reform Act of 1998. The Merchant agrees to provide the Carrier's Record Keeper with all the pertinent records, bill of lading or other shipping documents that it has in its possession, which may be required to substantiate the proper application of the Service Contract rates. The records shall be available for Commission's inspection at the following address:

Evergreen Shipping Agency (America) Corp.
as agent for Evergreen Line
One Evertrust Plaza,
Jersey City, NJ 07302
Contact Person: Manager of Tariff Department.
Tel: (201) 761-3361

10.    ASSIGNMENT CLAUSE:

The Merchant may not assign this Contract, including any or all of its right or liabilities hereunder, or otherwise permit any other person or entity, directly or indirectly, to utilize service rates or other terms provided by the Carrier hereunder, without the prior written consent of the Carrier. Without limitation of the foregoing, the Merchant agrees that it will not permit any other person or entity to co-load or otherwise include such other person's or entity's cargo in containers or other cargo carrying equipment tendered by the Merchant to the Carrier hereunder. If the Carrier, in its exclusive discretion, has reason to suspect that the Contract has been assigned, in whole or in part, by the Merchant, or that the Merchant has otherwise violated this provision, the Carrier may require the Merchant to produce documentation evidencing the Merchant's compliance therewith. In the event that the Merchant does not provide such documentation within thirty (30) days of the Carrier's request for same, the Carrier shall be entitled to conclude that the Merchant has violated this provision. Any container or other cargo carrying equipment tendered in violation of this provision shall be re-rated at twice the otherwise applicable rates and charges set forth in the Carrier's governing tariff(s), and the Carrier may also, at its option, terminate this Contract.

11.    TERMINATION:

After the Minimum Volume has been achieved and before the expiration date of this Contract, either party shall have the right to unilaterally terminate this Contract by providing a written notice of such termination to the other party.

12.    SEVERABILITY:

The Parties agree that if any clause of this Contract is held to be unenforceable, the remainder of the Contract shall remain in full force and effect.

13.    INTEGRATION:

This Contract constitutes the entire agreement between the Parties. Any Amendment to the Terms of this Contract may only be made by written agreement signed by both Parties (and, such agreement shall be filed with the Federal Maritime Commission and, if the Amendment is not subject to confidentiality and per the Ocean Shipping reform Act the Essential Terms shall likewise be updated).

SC-XXXXX

14.    ARBITRATION AND CHOICE OF LAW:

Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall at Carrier's option be subject to litigation in the United States District Court for the Southern District of New York or, alternatively, at Carrier's option shall be referred to arbitration before a panel of 3 arbitrators, one to be appointed by each of the Parties hereto and the third by the two so chosen. Their decision or that of any two of them shall be final, and, such award shall be enforceable pursuant to the Convention of the Recognition and the Enforcement of Foreign Arbitral Awards. In the event the Carrier chooses to exercise its option to arbitrate any dispute involved with the Contract, such arbitration shall take place pursuant to the Rules and Regulations of the Society of Maritime Arbitrators of the United States.  This Contract is to be governed by and construed in accordance with the laws of the United States and the State of New York.  In any such litigation or arbitration, the prevailing party shall be entitled to its cost of litigation and/or arbitration as applicable together with attorney's fees and expenses.

15.    MARITIME PORT SECURITY ACT OF 2002:

Shipper certifies that it will adhere to the provisions of the Maritime Transportation Security Act of 2002 and that in the event of any failure to do so it will indemnify, defend and hold Carrier harmless in the event of any claims, delays or penalties resulting from Shipper's failure to comply with the provision of said Act.

Notwithstanding any provision to the contrary in this Service Contract or any governing publication, including any limitation or restriction on the application of new surcharges during the term of this Contract, the parties agree that the following charges shall apply to the extent published in a publication governing this Contract at any time during the term of the Contract:

Any charge or surcharge relating to costs incurred in connection with newly-established security requirements (whether established by law, statute, regulation, or by a service provider to Carrier) applicable to or relating to any portion of the transportation and related services provided under this Contract.

16.    Hazardous Material

Regardless how the cargo is booked, Merchants shall be obligated to provide the Carrier in advance of shipment, with all up to date information within its knowledge as to the requirements for the safe care, custody and Carriage of the Goods.

17     Merchant certifies to Carrier that it will adhere to all requirements of the Department of Homeland Security in regard to information that has to be provided to the Department of Homeland Security in a timely fashion and Merchant further agrees that in the event that, for any reason, it does not provide the necessary information in a timely fashion and penalties are levied by the Department of Homeland Security or any other government agency, it will indemnify, defend and hold Carrier harmless from any and all such penalties that may be assessed as a result thereof.

9

# **EXHIBIT 3**

Abr. 17. 2012 12:05PM   BERRIOS CALL CTR                                    Nº3585   P. 1

SCXXXXX

| Service Contract No.: | SCxxxxx | Amendment No.: | |
|---|---|---|---|

Service Contract Essential Terms Publication No.:     EGLV-600

(Tariffs of General Applicability No.):               EGLV-601, 618

**Carrier Name:**     **Evergreen Line**
                      **A Joint Service Agreement (FMC#011982)**
                      **consisting of**
                      **1) Evergreen Marine Corp. (Taiwan) Ltd.**
                      **2) Evergreen Marine (UK) Limited**
                      **3) Italia Marittima SpA**
                      **4) Evergreen Marine (Hong Kong) Ltd.**
                      **5) Evergreen Marine (Singapore) Pte. Ltd.**

**Merchant Name:**         MUEBLERIAS BERRIOS

Further, MERCHANT party named herein certifies its status and that of any affiliate(s)/subsidiary(ies) named herein as (check appropriate box(es)):

NVOCC

MERCHANTS' ASSOCIATION

OWNER OF CARGO          [X]

OTHER (Please Specify)

Bond No.:        Org.No.

Elena Vizcarrondo                   Date 4/17/12          Mr. Noel Berrios          Date 4/17/12
Account Executive                                         President
Evergreen Shipping Agency (America) Corp.                 Mueblerias Berrios
As Agent for Evergreen Line

EGA-0058-31 02/09/12

SC-XXXXX

This is a service contract pursuant to the Ocean Shipping reform Act of 1998 and FMC rules at 46 C.F.R. 530 el, seq., between "CARRIER" and "MERCHANT" ( or, jointly, "PARTIES") parties named herein. The contract Parties declare that the terms set forth herein together with the essential terms as published in Carrier Service Contract Essential Terms Tariffs No. EGLV-600, pursuant to 46 CFR 520.4(d), the rules published in the tariff in the Carrier Automated Publication which can be found at www.evergreen-line.com constitute the true and complete copy of all aspects of this contract except as to confidential matters contained herein which, pursuant to the Ocean Shipping Reform Act of 1998, shall be included in the essential terms filing and publication.

Records maintained to support shipments under this Service Contract are: bills of lading, shipping manifests, and other related written correspondence between Contract Parties.

Contact person for records in the event of a request by the Federal Maritime Commission:

Evergreen Shipping Agency (America) Corp.
Manager of Tariff Department
One Evertrust Plaza,
Jersey City, NJ 07302
(201) 761-3361  FAX (201) 761-3005
e-mail : ibdbcdtrf@evergreen-shipping.us

**Address for Carriers:** 1) 166, Min-Sheng East Road, Sec. 2,
Taipei, Taiwan, R.O.C.
2) Evergreen House 160 Eustion Rd.
London, NW12DX, U.K.
3) 4 Passeggio S.Andrea, 34123
Trieste, Italy
4) 22-23 Floor, Harcourt House,
39 Gloucester Road, Wan Chai, Hong Kong
5) 200 Cantonment Road, #12-01 Southpoint
Singapore 089763

**Address for Merchants:**

**Name and Address of Affiliates: (Please see Appendix A )**

2

SC-XXXXX

This Contract is made between the aforesaid Contract Parties for the transportation of the commodities as listed below covered by the following clauses and conditions.

**Commodity: (Please see Appendix B )**

1.  **CONTRACT PARTIES AND DURATION**

    1.1   The Service Contract is only applicable to the Merchant identified herein and any affiliates, subsidiaries or third Parties which are specifically identified in writing in this Contract. This Contract shall not be used by any Party not specifically identified herein. Any use of this Contract by Parties other than those specified herein shall be grounds for termination of this Agreement.

    1.2   If, after execution of this Contract, the Merchant acquires a company that ships the commodities covered under this Contract, the newly acquired company's tonnage may be included under the Contract after the Merchant has submitted to the Carrier documentary proof of such acquisition and the Carrier has concurred in such inclusion. Also if, after execution of this Contract, the Merchant proposes to delete an entity from the list of its Affiliates, upon concurrence by the Carrier such entity shall cease to be a Party to this Contract.

    1.3   This Contract shall have effect from the date of <u>April/15/2012</u> through <u>April/14/2013</u>. 46 C.F.R. 530.12 requires that certain Essential Terms of Service Contract shall be published as a separate part in the Carrier Automated Tariff Publication. The Contract Rates and Terms shall not be implemented prior to the effective date of the tariff Essential Terms filing, made coincident with that publication with the U.S. Federal Maritime Commission.

    1.4   The Merchant whether he be a beneficial owner of the cargo, NVOCC or other is entering into this Service Contract as an independent contractor and in no event shall be considered an agent of the Carrier whether under this Service Contract or the Carrier's bill of lading/Sea Waybill. Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use the Agreement.

2.  **GENERAL APPLICATION:**

    2.1   This Contract shall be governed by the prevailing and effective rules of Carrier's Service Contract tariff in effect at the time of shipment, including reissues and amendments thereto, unless otherwise specified in the Contract.

          Cargo covered by this Contract shall be carried by vessels owned, chartered, managed or operated by the Carrier under the provisions of the Carrier's Bill of Lading and the Rules and Regulations of the pertinent Tariff(s) of General Applicability. "Notwithstanding the foregoing, if a conflict of terms arises, the provisions as per the Bill of Lading shall prevail."

    2.2   For the purposes of this Contract, the term Merchant shall mean the owner of the cargo or the person for whose account the ocean transportation of the cargo is to be provided or the person to whom delivery is to be made.

3

SC-XXXXX

2.3    The Carrier reserves the right to cancel this Contract immediately upon written notice to the Merchant upon occurrence of one of the following:

(1)The Merchant becomes insolvent.

(2)The Merchant files a Bankruptcy Petition.

(3) The Merchant commits any act which defrauds or endangers the interests of the Carrier, its vessels, including chartered vessels and vessels provided by its slot charter partners, its agents, subcontractors, equipment of personnel, including but not limited to: illegal movement of contraband or other commodities without proper legal license in the countries of origin or destination; improper stuffing, blocking or labeling of cargo in such a manner as to pose a danger to the Carrier, its agents, equipment or personnel.

(4) The merchant fails to pay freight and charges when due hereunder and

(5) The merchant is found to be holding itself out as the agent for the carrier in merchant's Bill of lading or alternatively is allowing unauthorized shippers to use this service contract.

2.4    The Carrier further reserves the right to cancel this Contract upon 30 days prior written notice to the Merchant upon occurrence of any one of the following:
The performance of the Merchant under the Contract indicates that it will be unable to meet the Minimum Volume Commitment set forth herein.

The Merchant is found to be mis-declaring commodities shipped, shipping goods under the Contract which are not included in the commodities listed in the Contract or is found to be allowing non-Contract Parties to use the Contract.

The Merchant is found to be improperly labeling hazardous, poisonous or dangerous goods in violation of Coast Guard regulations and International Conventions.



If this Contract is cancelled pursuant to this subparagraph 2.3, 2.4 all shipments shall be re-rated as per non-contract tariff rate applicable at time of shipment(s). (Or, if there is no applicable commodity rate, the cargo shall be re-rated at 130% of the applicable service contract rate together with all applicable surcharges).

3.    SERVICE COMMITMENT:

3.1    During the term of this Contract, the Carrier agrees to make available vessel capacity adequate to carry (a) the Minimum Quantity Commitment of cargo as specified in Article 5, and (b) at the Carrier's option, any additional cargo tendered by the Merchant. The Merchant agrees that, insofar as possible, cargo committed under this Contract will be shipped evenly throughout the duration of the Contract. The Merchant agrees to give booking notice to the Carrier at least seven (7) working days in advance of sailing date for port-to-port cargo, and at least fourteen (14) working days in advance of the sailing date for cargo originating at an inland point for Carrier haulage (Intermodal cargo).

3.2    The Carrier and Merchant agree that in light of the fact that the volume and timing of cargo tendered hereunder for particular sailings is in the control of the Merchant, who cannot specify with certainty the amount of cargo which it will tender on any given date, and by virtue of the fact that the Carrier has a finite amount of space on its vessels in which to carry the Merchant's cargo as well as cargo carried pursuant to Service Contracts entered into with other Merchants in the trade, some flexibility is needed by the Carrier with respect to its service commitment to the Merchant hereunder. Accordingly,

SC-XXXXX

the parties hereto agree that in the event that the Merchant is unable to secure space on any particular vessel of the Carrier after giving timely booking notice to the Carrier defined in subparagraph 3.1 , then, upon the Merchant's written request submitted within seven (7) working days of such occurrence together with essential supporting documents which are later confirmed to be accurate, the Merchant may elect one of the following options:

3.2.1   The Carrier will subtract the quantity of cargo tendered but not carried on Carrier's vessel from the Minimum Quantity Commitment. However, any such reduction of Minimum Quantity Commitment shall not exceed the quantity counted on a pro rata basis.  Such pro rata basis shall be defined as the Minimum Quantity Commitment divided by the Carrier's total sailings from all ports of loading named in Article 4 (cumulatively) during the term of the Contract, or,

3.2.2   If the Merchant does not elect to reconcile the shortage by reducing the Minimum Quantity Commitment set forth in Article 5, pursuant to subparagraph 3.2.1 above, then such shortage will be reconciled upon expiration of the Contract by extending the term of the Contract pursuant to the following formula:

No. of TEUS (FEUS if
applicable) deductible
pursuant to Clause 3.2.1  =  Maximum Number
----------------------------        of Additional
The pro rata basis (as          Sailings
defined in Clause 3.2.1

Notwithstanding the above formula, in no event shall the extension exceed ten (10) consecutive sailings.  The extension of the term of this Contract pursuant to this Section must be filed in writing on or before the expiration date with the FMC as per 46 C.F.R. 530.8.

4.    SERVICE PERFORMED BY THE CARRIER - ORIGIN/DESTINATION:

4.1 Origin – Port Ranges and Geographic Points
        (Please see Appendix D )

4.2 Destination – Ports Ranges and Geographic Points
        (Please see Appendix D )

4.3 Service Type

        4.3.1   Water and/or Intermodal Service.
                Intermodal shipments will be received at or delivered to the terminal, ramp or depot designated by the Carrier, unless otherwise specified in Attachments hereto.

5

SC-XXXXX

5.   MINIMUM QUANTITY COMMITMENT:

In consideration of this Contract's rates, charges and terms specified herein, the Merchant agrees to tender to the Carrier, a minimum of **1200 TEUS FCL/FCL (LCL/FCL)** containers loaded with commodities as specified herein which shall be tendered to Carrier evenly throughout the terms of this contract, (hereinafter "Minimum Quantity Commitment"). For the purpose of this Contract, a 20' container is a dry cargo (8'6" high) standard container, without chassis attached, except as otherwise specified in this Contract for special equipment provided by the Carrier.   For the calculation of the Minimum Quantity Commitment and liquidated damages under this Contract, the following shall apply:

20 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 TEU

40 - FOOT CONTAINER SHALL BE EQUAL TO 1.00 FEU OR 2.00 TEU

40 - FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.125 FEU OR 2.25 TEU

45'- FOOT (9'6") HIGH CUBE CONTAINER SHALL BE EQUAL TO 1.266 FEU OR 2.53 TEU

6.   CONTRACT RATES AND CHARGES:

6.1   In consideration of this Contract, the Carrier agrees that the following Contract Rates, Notes and Charges will apply:   **(Please see Appendix E,F)**

Surcharges, Additional Charges Clause:

Except as specifically provided in this Article 6, all charges, surcharges, arbitraries, origin and destination delivery charges, add-ons and other additional charges, and all rules in the Carrier's pertinent Tariff of General Applicability, which would thereunder be applicable to the movement of the commodities covered by this Contract shall be assessed in full at the time of shipment.

Notwithstanding other provision of this Contract, including but not limited to any "no-new-surcharge" clause, Shipper shall be subject to any rule in the Governing Tariff establishing a charge relating to any of the following circumstances or charges arising or taking effect subsequent to the effective date of this Contract: a strike, lockout, work stoppage, or other labor unrest; origin or destination port or inland congestion; security requirements or costs; taxes, fees or charges levied by any federal, state or local governmental entity, or by any port or harbor authority; increased inland transportation costs resulting from federal, state, or local legislative or regulatory action, including action by any port or harbor authority; or clean air requirements ; or increased cost due to war risk and terrorism.

In the event of any conflict between the terms on this Article 6.1 and Article 7 (Force Majeure), the terms of Article 6.1 shall prevail.

SC-XXXXX

7.   **FORCE MAJEURE CLAUSE:**

In the event that the execution of obligations entailed by this Contract are prevented by Force Majeure circumstances, including work stoppages, strikes, accidents, casualties, lockouts, fire, transportation disasters, acts of God, governmental restraints (including governmental import restrictions and voluntary quotas arising from the threat of governmental restraints), war or hostilities, terrorism, piracy, embargoes or other similar conditions except commercial contingencies (e.g., changing markets, business declines, etc.), or civil commotions, the Merchant or the Carrier shall notify the other party in writing of the existence of such circumstances within seven (7) working days of such occurrence and of the effect on its ability to perform its obligations hereunder. Upon receipt of such written notice and establishment of the existence of Force Majeure conditions, as supported by essential documentation, the parties shall be excused from their obligations under this Contract to the extent of and for the duration of the disability. Upon cessation of the disability, the Contract obligations shall be reinstated, and the Minimum Quantity Commitment in Article 5 shall be adjusted by 1/ **XXX** per day of the actual effectiveness of the disability rounded upwards to the next full container. (The Merchant and the Carrier agree that publication by the Carrier of appropriate paid notices in widely distributed trade publications shall constitute notice to the Merchant in writing under this Article 7).

8.   **LIQUIDATED DAMAGES CLAUSE:**

8.1     The Carrier and the Merchant agree that breaches of this Contract cause not only loss of freight but also instability and adverse impact on Carrier marketing, logistics and stowage planning, and accordingly, agree that in lieu of all damages which are difficult to calculate, liquidated damages shall be assessed if the Merchant fails to tender either the Minimum Quantity Commitment or any other sub-Minimum Quantity Commitment(s) wherever specified in this Contract. Upon the occurrence of such failure by the Merchant, the Carrier shall invoice the Merchant and the Merchant agrees to pay liquidated damages on the difference between the quantity of cargo actually shipped and the Minimum Quantity Commitment, or where applicable any other sub-Minimum Quantity Commitment(s), at the rate of US$250 per FEU. The total of any amounts due hereunder shall be paid directly to the Carrier within thirty (30) days following issuance of written notification by the Carrier. The amount is hereby acknowledged and agreed upon as reasonable liquidated damages and not as a penalty. In the event that liquidated damages pursuant to this clause are not paid by the Merchant within thirty (30) days, the Merchant shall be liable to the Carrier for all costs incurred in collecting said liquidated damages including but not limited to court costs, expenses and attorney's fee incurred in the collection thereof.

8.2     If the Carrier fails to fulfill its Service Commitment in Article 3 hereof during the Contract term, the Merchant's remedy shall be either (1) reduction of the Minimum Quantity Commitment by the quantity of cargo tendered but not carried as provided in subparagraph 3.2.1 or, (2) the extension of the Contract term as specified in Clause 3.2.2. The Carrier shall not be liable to the Merchant for any direct, consequential or other damages under this Contract, except as set forth in Article 3, nor shall any liabilities or obligations of the Merchant to the Carrier be subject to any offset or credit by virtue of any monies which the Merchant may claim are due him under this Contract or otherwise.

SC-XXXXX

9.   AUDIT AND RECORD RETENTION:

The Carrier and the Merchant shall maintain records and conduct audits in accordance with the
requirements of the Federal Maritime Commission and the Shipping Reform Act of 1998. The
Merchant agrees to provide the Carrier's Record Keeper with all the pertinent records, bill of
lading or other shipping documents that it has in its possession, which may be required to
substantiate the proper application of the Service Contract rates. The records shall be available
for Commission's inspection at the following address:

     Evergreen Shipping Agency (America) Corp.
     as agent for Evergreen Line
     One Evertrust Plaza,
     Jersey City, NJ 07302
     Contact Person: Manager of Tariff Department.
     Tel: (201) 761-3361

10.   ASSIGNMENT CLAUSE:

The Merchant may not assign this Contract, including any or all of its right or liabilities hereunder,
or otherwise permit any other person or entity, directly or indirectly, to utilize service rates or other
terms provided by the Carrier hereunder, without the prior written consent of the Carrier. Without
limitation of the foregoing, the Merchant agrees that it will not permit any other person or entity to
co-load or otherwise include such other person's or entity's cargo in containers or other cargo
carrying equipment tendered by the Merchant to the Carrier hereunder. If the Carrier, in its
exclusive discretion, has reason to suspect that the Contract has been assigned, in whole or in
part, by the Merchant, or that the Merchant has otherwise violated this provision, the Carrier may
require the Merchant to produce documentation evidencing the Merchant's compliance therewith.
In the event that the Merchant does not provide such documentation within thirty (30) days of the
Carrier's request for same, the Carrier shall be entitled to conclude that the Merchant has violated
this provision. Any container or other cargo carrying equipment tendered in violation of this
provision shall be re-rated at twice the otherwise applicable rates and charges set forth in the
Carrier's governing tariff(s), and the Carrier may also, at its option, terminate this Contract.

11.   TERMINATION:

After the Minimum Volume has been achieved and before the expiration date of this Contract,
either party shall have the right to unilaterally terminate this Contract by providing a written notice
of such termination to the other party.

12.   SEVERABILITY:

The Parties agree that if any clause of this Contract is held to be unenforceable, the remainder of
the Contract shall remain in full force and effect.

13.   INTEGRATION:

This Contract constitutes the entire agreement between the Parties. Any Amendment to the
Terms of this Contract may only be made by written agreement signed by both Parties (and, such
agreement shall be filed with the Federal Maritime Commission and, if the Amendment is not
subject to confidentiality and per the Ocean Shipping reform Act the Essential Terms shall
likewise be updated).

8

SC-XXXXX

14.   ARBITRATION AND CHOICE OF LAW:

Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall at Carrier's option be subject to litigation in the United States District Court for the Southern District of New York or, alternatively, at Carrier's option shall be referred to arbitration before a panel of 3 arbitrators, one to be appointed by each of the Parties hereto and the third by the two so chosen. Their decision or that of any two of them shall be final, and, such award shall be enforceable pursuant to the Convention of the Recognition and the Enforcement of Foreign Arbitral Awards. In the event the Carrier chooses to exercise its option to arbitrate any dispute involved with the Contract, such arbitration shall take place pursuant to the Rules and Regulations of the Society of Maritime Arbitrators of the United States. This Contract is to be governed by and construed in accordance with the laws of the United States and the State of New York. In any such litigation or arbitration, the prevailing party shall be entitled to its cost of litigation and/or arbitration as applicable together with attorney's fees and expenses.

15.   MARITIME PORT SECURITY ACT OF 2002:

Shipper certifies that it will adhere to the provisions of the Maritime Transportation Security Act of 2002 and that in the event of any failure to do so it will indemnify, defend and hold Carrier harmless in the event of any claims, delays or penalties resulting from Shipper's failure to comply with the provision of said Act.

Notwithstanding any provision to the contrary in this Service Contract or any governing publication, including any limitation or restriction on the application of new surcharges during the term of this Contract, the parties agree that the following charges shall apply to the extent published in a publication governing this Contract at any time during the term of the Contract:

Any charge or surcharge relating to costs incurred in connection with newly-established security requirements (whether established by law, statute, regulation, or by a service provider to Carrier) applicable to or relating to any portion of the transportation and related services provided under this Contract.

16.   Hazardous Material

Regardless how the cargo is booked, Merchants shall be obligated to provide the Carrier in advance of shipment, with all up to date information within its knowledge as to the requirements for the safe care, custody and Carriage of the Goods.

17   Merchant certifies to Carrier that it will adhere to all requirements of the Department of Homeland Security in regard to information that has to be provided to the Department of Homeland Security in a timely fashion and Merchant further agrees that in the event that, for any reason, it does not provide the necessary information in a timely fashion and penalties are levied by the Department of Homeland Security or any other government agency, it will indemnify, defend and hold Carrier harmless from any and all such penalties that may be assessed as a result thereof.

# **EXHIBIT 4**

SC-XXXXX

## Appendix A - Affiliates/Subsidiaries/Association Members

| No. | COMPANY NAME | COMPANY ADDRESS | AMD |
|---|---|---|---|
| | EMPRESAS BERRIOS | SAN JUAN, PUERTO RICO | |
| | EMPRESAS BERRIOS INVENTORY & OPERATIONS INC. | SAN JUAN, PUERTO RICO | |
| | SUPER BUY FURNITURE | SAN JUAN, PUERTO RICO | |

# **EXHIBIT 5**

Appendix F  Notes-USA Cargo

AMD

Note 1 :  Except otherwise specified,all rates in this contract are subject to the addition
of all charges as per published in governing tariff at time of shipment, including
but not limited to following charges :

Demurrage Charges /  Equipment Detention Charges

Diversion Charges

Inland Fuel Charge(IFS)

Port Security Charge(SC/D)

Security Compliance Management Surcharge (SCMC)

Value Added Tax(VAT)

Note 1A :  Bunker Charge (BAC) is included for all rates in this contract.

Note 1B :  Panama Canal Charge (PCC) is included for all rates in this contract.

Note 1C :  Any General Rate Increase (GRI) is Not Applicable in this contract.

Note 1D:  Peak Season Surcharge (PSS) is Not Applicable in this contract.

Note 1E:  Any General Rate Restoration (GRR) is Not Applicable in this contract.

Note 1F:  Currency Adjustment factor (CAF/L) of Japan is included for all rates in this contract.

Note 7:   As per mutually agreed, An otherwise defined Demurrage and/or Per Diem freetime
will be applied as follows:
(Please see Appendix G)

EOA-0059-31  020012

Appendix Q - Demurrage/Detention

AMM

Free time shall be calculated from the date the equipment is removed from the carrier's terminal or depot.
Free time includes pick up and return day.

The extended free time provided above are subject to Carrier's option to stop this offer upon 10
days prior written notice to the merchant whenever Carrier faces railroad congestion,
chassis shortage and any force majeure circumstances.

Demurrage
23 CALENDAR DAYS AT SAN JUAN, PUERTO RICO

Detention (Per Diem)

Detention Free-Time allowed at destination :
SAN JUAN, PUERTO RICO
Free time for each container (except special equipment) is
15 CALENDAR DAYS

SB-04(04)  02505J

**EXHIBIT 6**



**EVERGREEN LINE**

PO Box 9021548
San Juan, PR 00902-1548
Tel: (787) 474-0050
Fax: (787) 474-0055

## PR Importing & Stevedoring Co.

August 8, 2014

Empresas Berrios, Inc.
   d/b/a Mueblerias Berrios
Carr. #172, KM 49.7
Int. Carr. 787, Bo. Bayamón,
Cidra, Puerto Rico, 00739
Attention: Noel Berrios

      Re:    Service Contract between Evergreen Line and Mueblerias Berrios No.
             SC47252, effective April 17, 2012

             Service Contract between Evergreen Line and Mueblerias Berrios No.
             SC50244, effective April 15, 2013

             Service Contract between Evergreen Line and Mueblerias Berrios No.
             SC54122, effective March 27, 2014

Dear Mr. Berrios:

We write in connection with the above-referenced Service Contracts (the **"Contracts"**), entered into between Evergreen Line as Carrier (the **"Carrier"**) and Mueblerias Berrios as Merchant (the **"Merchant"**). Each Contract identifies and is signed by a single Merchant, i.e., Mueblerias Berrios. Other than Evergreen Line, there are no other parties to the Contracts.

We draw your attention to section 1.4 of the Contracts, which states, in relevant part: "Notwithstanding anything to the contrary, the Merchant signing this remains fully responsible for the complete performance of this agreement regardless of whether any affiliates, subsidiaries or third parties are entitled to use this Agreement."

Please find attached hereto pending invoice Statement for services and other obligations, including demurrage/detention charges of ocean cargo, incurred under the Contracts. (**Invoices may be provided upon request**). As of this writing, the Invoices are unpaid, due and owing.

*As Agent for Evergreen Line*

*August 8, 2014*
*Page 2*

Pursuant to the above-quoted section of section 1.4, the Merchant (Mueblerias Berrios) is fully responsible for performing, among other things, the payment obligations under the Contracts. Accordingly, we hereby make demand on the Merchant to make immediate and full payment on the Invoices. And, we advise the Merchant that if the Invoices have not been fully satisfied by Monday, August 18, 2014, the Carrier will continue to exercise its rights to collect on the Invoices from the Merchant, including but not limited to, the Merchant's rights under section 14 of the Contracts.

If you have any questions regarding this matter, please feel free to contact me at (787) 410-7405.

In the meantime, and at all times, the Carrier reserves all of its rights and remedies under the Contracts, at law, equity and otherwise, and waives no rights available to Carrier.

Very truly yours,

Jose Oller,
President
Evergreen Line
   *by* Evergreen Shipping Agency
       (America) Corp. as Agent
   *by* Puerto Rico Importing & Stevedoring Co. As agent

cc: Douglas Spencer
cc: Lic. Rafael Vizcarrondo

PRISCO/EVERGREEN LINES

PO BOX 9021548
SAN JUAN P R 00902-1548

# Statement

| Date |
| --- |
| 7/9/2014 |

To:

SUPER BUY FURNITURE
CARR 172 KM 49.7 CIDRA PR 00739
DM -PRS000186

| Amount Due | Amount Enc. |
| --- | --- |
| $988,570.00 | |

| Date | Transaction | Amount | Balance |
| --- | --- | --- | --- |
| 01/29/2014 | INV #1401000077. Due 01/29/2014. Orig. Amount $48,700.00. | 48,700.00 | 48,700.00 |
| 02/27/2014 | INV #1402000042. Due 02/27/2014. Orig. Amount $28,350.00. | 28,350.00 | 77,050.00 |
| 03/06/2014 | INV #1403000042. Due 03/06/2014. Orig. Amount $27,600.00. | 27,600.00 | 104,650.00 |
| 03/07/2014 | INV #1402000035. Due 03/07/2014. Orig. Amount $28,850.00. | 28,850.00 | 133,500.00 |
| 03/07/2014 | INV #140300008. Due 03/07/2014. Orig. Amount $7,400.00. | 7,400.00 | 140,900.00 |
| 03/12/2014 | INV #1403000081. Due 03/12/2014. Orig. Amount $34,350.00. | 34,350.00 | 175,250.00 |
| 03/12/2014 | INV #11403000060. Due 03/12/2014. Orig. Amount $26,320.00. | 26,320.00 | 201,570.00 |
| 03/13/2014 | INV #1403000061. Due 03/13/2014. Orig. Amount $12,105.00. | 12,105.00 | 213,675.00 |
| 03/13/2014 | INV #1403000002. Due 03/13/2014. Orig. Amount $15,800.00. | 15,800.00 | 229,475.00 |
| 03/13/2014 | INV #1403000010. Due 03/13/2014. Orig. Amount $12,415.00. | 12,415.00 | 241,890.00 |
| 03/13/2014 | INV #14030000-08. Due 03/13/2014. Orig. Amount $7,350.00. | 7,350.00 | 249,240.00 |
| 03/13/2014 | INV #14030000065. Due 03/13/2014. Orig. Amount $43,800.00. | 43,800.00 | 293,040.00 |
| 03/13/2014 | INV #1403000087. Due 03/13/2014. Orig. Amount $22,950.00. | 22,950.00 | 315,990.00 |
| 03/13/2014 | INV #1403000088. Due 03/13/2014. Orig. Amount $7,050.00. | 7,050.00 | 323,040.00 |
| 03/13/2014 | INV #1403000090. Due 03/13/2014. Orig. Amount $50.00. | 50.00 | 323,090.00 |
| 03/17/2014 | INV #1403000099. Due 03/17/2014. Orig. Amount $22,350.00. | 22,350.00 | 345,440.00 |
| 03/17/2014 | INV #1403000104. Due 03/17/2014. Orig. Amount $13,250.00. | 13,250.00 | 358,690.00 |
| 03/18/2014 | INV #1403000091. Due 03/18/2014. Orig. Amount $6,300.00. | 6,300.00 | 364,990.00 |
| 03/21/2014 | INV #1403000106. Due 03/21/2014. Orig. Amount $15,300.00. | 15,300.00 | 380,290.00 |
| 03/21/2014 | INV #1403000111. Due 03/21/2014. Orig. Amount $30,100.00. | 30,100.00 | 410,390.00 |
| 03/21/2014 | INV #1403000112. Due 03/21/2014. Orig. Amount $40,600.00. | 40,600.00 | 450,990.00 |
| 03/27/2014 | INV #1403000117. Due 03/27/2014. Orig. Amount $30,150.00. | 30,150.00 | 481,140.00 |
| 03/27/2014 | INV #1403000118. Due 03/27/2014. Orig. Amount $18,950.00. | 18,950.00 | 500,090.00 |
| 04/14/2014 | INV #1404000037. Due 04/14/2014. Orig. Amount $5,050.00. | 5,050.00 | 505,140.00 |
| 04/14/2014 | INV #1404000036. Due 04/14/2014. Orig. Amount $5,300.00. | 5,300.00 | 510,440.00 |
| 04/14/2014 | INV #1404000066. Due 04/14/2014. Orig. Amount $39,250.00. | 39,250.00 | 549,690.00 |
| 04/14/2014 | INV #1404000064. Due 04/14/2014. Orig. Amount $3,000.00. | 3,000.00 | 552,690.00 |
| 04/16/2014 | INV #1404000083. Due 04/16/2014. Orig. Amount $37,000.00. | 37,000.00 | 589,690.00 |
| 04/16/2014 | INV #1404000080. Due 04/16/2014. Orig. Amount $24,200.00. | 24,200.00 | 613,890.00 |
| 04/18/2014 | INV #1405000017. Due 04/18/2014. Orig. Amount $2,100.00. | 2,100.00 | 615,990.00 |
| 04/29/2014 | INV #1404000105. Due 04/29/2014. Orig. Amount $4,700.00. | 4,700.00 | 620,690.00 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
| --- | --- | --- | --- | --- | --- |
| 0.00 | 104,800.00 | 99,600.00 | 284,080.00 | 500,090.00 | $988,570.00 |

PRISCO/EVERGREEN LINES

# Statement

PO BOX 9021548
SAN JUAN P R 00902-1548

| Date |
|------|
| 7/9/2014 |

To:

SUPER BUY FURNITURE
CARR 172 KM 49.7 CIDRA PR 00739
DM -PRS000186

| Amount Due | Amount Enc. |
|------------|-------------|
| $988,570.00 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 04/29/2014 | INV #1404000104. Due 04/29/2014. Orig. Amount $25,000.00. | 25,000.00 | 645,690.00 |
| 04/29/2014 | INV #1404000100. Due 04/29/2014. Orig. Amount $5,400.00. | 5,400.00 | 651,090.00 |
| 05/01/2014 | INV #1405000002. Due 05/01/2014. Orig. Amount $54,250.00. | 54,250.00 | 705,340.00 |
| 05/06/2014 | INV #1405000014. Due 05/06/2014. Orig. Amount $4,200.00. | 4,200.00 | 709,540.00 |
| 05/06/2014 | INV #1405000012. Due 05/06/2014. Orig. Amount $2,850.00. | 2,850.00 | 712,390.00 |
| 05/06/2014 | INV #1405000006. Due 05/06/2014. Orig. Amount $2,300.00. | 2,300.00 | 714,690.00 |
| 05/07/2014 | INV #1405000024. Due 05/07/2014. Orig. Amount $69,480.00. | 69,480.00 | 784,170.00 |
| 05/13/2014 | INV #1405000028. Due 05/13/2014. Orig. Amount $28,000.00. | 28,000.00 | 812,170.00 |
| 05/15/2014 | INV #1405000032. Due 05/15/2014. Orig. Amount $25,950.00. | 25,950.00 | 838,120.00 |
| 05/15/2014 | INV #1405000030. Due 05/15/2014. Orig. Amount $7,050.00. | 7,050.00 | 845,170.00 |
| 06/03/2014 | INV #1405000047. Due 06/03/2014. Orig. Amount $38,600.00. | 38,600.00 | 883,770.00 |
| 06/17/2014 | INV #1406000018. Due 06/17/2014. Orig. Amount $60,500.00. | 60,500.00 | 944,270.00 |
| 06/20/2014 | INV #1406000035. Due 06/20/2014. Orig. Amount $550.00. | 550.00 | 944,820.00 |
| 06/20/2014 | INV #1406000038. Due 06/20/2014. Orig. Amount $450.00. | 450.00 | 945,270.00 |
| 06/27/2014 | INV #1406000051. Due 06/27/2014. Orig. Amount $12,750.00. | 12,750.00 | 958,020.00 |
| 06/27/2014 | INV #1406000050. Due 06/27/2014. Orig. Amount $5,450.00. | 5,450.00 | 963,470.00 |
| 06/27/2014 | INV #1406000049. Due 06/27/2014. Orig. Amount $18,050.00. | 18,050.00 | 981,520.00 |
| 06/30/2014 | INV #1406000052. Due 06/30/2014. Orig. Amount $950.00. | 950.00 | 982,470.00 |
| 06/30/2014 | INV #1406000053. Due 06/30/2014. Orig. Amount $3,900.00. | 3,900.00 | 986,370.00 |
| 06/30/2014 | INV #1406000054. Due 06/30/2014. Orig. Amount $2,200.00. | 2,200.00 | 988,570.00 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 0.00 | 104,800.00 | 99,600.00 | 284,080.00 | 500,090.00 | $988,570.00 |